## ABRAM et al. v. SAN JOAQUIN COTTON OIL CO.

### No. 2032.

District Court, S. D. California,
Central Division.

March 5, 1943.

See, also, 46 F.Supp. 969.

Jonathan H. Rowell, of San Francisco, Cal., and George E. Bodle and Louis R. Stein, both of Los Angeles, Cal., for plaintiffs.

Newlin & Ashburn, Paul Sandmeyer, and Ray J. Coleman, all of Los Angeles, Cal., for defendant.

J. F. T. O'CONNOR, District Judge.

This is an action to recover unpaid overtime compensation, an additional amount as liquidated damages, and attorney fees, pursuant to 29 U.S.C.A. § 216(b) of the Fair Labor Standards Act, hereinafter referred to as the Act.

Inasmuch as the principal questions are of first impression, determination thereof must be accomplished without the aid of judicial precedent. The processing of cotton seed is an important industry in California and in many other states. The laborers employed and the owners and operators of plants engaged in the processing of cotton seed should have a careful determination of their rights.

Specifically, the issues submitted involve:

1. The interstate character of the plaintiffs' activities.

2. Whether the plaintiffs, who are actively engaged in or about the defendant's plant, while processing cotton seed, are entitled to the benefits of sec. 7(a) of the Act or are exempt by reason of sec. 7(c).

3. Whether the plaintiffs, who are actively engaged in or about the defendant's cotton seed plant during the dormant season, are entitled to the benefits of sec. 7 (a) of the Act or are exempt by reason of sec. 7(c).

4. Whether one of the plaintiffs, who is actively engaged in or about the defendant's plant, while processing flax seed, is entitled to the benefits of sec. 7(a) of the Act or is exempt by virtue of sec. 7(c).

5. Whether one of the plaintiffs herein was acting as an executive within the exemption of sec. 213(a) (1).

The litigation is predicated upon the following stipulated facts:

The plaintiffs were employees of the defendant, San Joaquin Cotton Oil Company, which is a California corporation. The defendant owns and operates a cotton seed oil mill plant in Madera County, California, where it is located adjacent

to the limits of the town of Chowchilla. Issues with which this court is concerned relate to the defendant's operation of processing cotton seed and flax seed insofar as such operation affects the plaintiffs' right to benefits claimed herein.

"The cottonseed processing season usually commences in October about two weeks after the commencement of the ginning season. Practically all of the seed is brought to the plant by truck, though occasionally some is shipped by rail. A large quantity of seed is brought to the plant in a relatively short period of time. The quantity of seed received daily exceeds the daily capacity of the mill and, therefore, when received the surplus seed is placed in a seed storage house. When the seed arrives at the mill it contains a certain amount of trash, i. e., twigs, leaves, bolls, sand, etc., picked up in the fields and in handling. * * * The following operations are performed in connection with the processing of cottonseed: (a) The seed is conveyed from the storage house to the cleaner room in the main building, where it is cleaned by mechanical process and the trash removed. (b) The seed then passes into the first cut linter room, where machines remove part of the lint fibers from the hull. (bb) The lint passes into another room where it is condensed, baled and sold as cotton linters. (c) The seed then passes into the second cut linter room and again run through linter machines. (cc) The lint is condensed, baled and sold as second cut cotton linters. (d) The seed then passes through machines which remove and separate the hull from the kernels. The hulls are conveyed to the hull house. (e) The kernels then pass to the press room and there they are: (i) passed through rollers, (ii) cooked, (iii) formed into slabs and wrapped with cloth, (iv) placed in the presses where the oil is pressed out and run into tanks adjacent to the mill. (ee) The slabs are cracked into smaller pieces. A portion is sold as cracked cottonseed cake. The greater part is ground into cottonseed meal. (f) The oil is run from the tanks mentioned in subparagraph (e) into tanks in a small building (the so-called "refinery") adjacent to the main building and is there agitated and sprayed with sodium hydroxide and heated. After standing for several hours, the oil is pumped off into another tank; water is added and the oil is agitated with air and then allowed to stand and then dried. The oil is then pumped off and placed in tanks adjacent to the mill and near the spur railroad tracks ready for shipment. By this treatment, free fatty acids, gum and coloring matter sink to the bottom of the tanks and this substance is sold as soap stock. The operations mentioned in this paragraph * * * are continuous and are being performed simultaneously. All of the above operations are performed and completed while the mill is in operation i. e., while the seed is being crushed, with the exception of possibly two or three days. The oil is shipped out as produced and, except for a few cars, is shipped while the seed is being crushed. Adjoining the mill are feeding yards for cattle. The feeders purchase cottonseed hulls and cottonseed meal from the company and have the company mix these with barley and other grains supplied by the feeders. While the seed is being received, occasional samples are taken and analyzed which determines the quality and price paid for cottonseed in this district. After the lint is removed, the seed is analyzed to determine how much lint is left on the seed. After the hulls have been removed from the kernels, the hulls are analyzed to determine the amount of kernel or meat left with the hulls. After the kernels have passed through the presses, the cake is analyzed and the oil is analyzed. While the oil is being treated as described in subparagraph (f) * * *, color tests and tests for free fatty acid are made. Samples of the same oil receive similar treatment in the laboratory and tests thereof made. The work in this paragraph mentioned is performed by the Assistant Chemist under the supervision of the Chief Chemist and some by the Chief Chemist. The analyses in this paragraph mentioned are performed in the laboratory which is located in a room in the so-called refinery building. All of the hulls and mixed feed produced at the plant are sold, used and consumed in the State of California. A substantial part of the linters, cottonseed meal and cake is sold in interstate commerce. This mill produces between 200 and 300 tank cars of cottonseed oil per annum. All of the cottonseed oil produced at the plant is sold and delivered in the State of California, practically all thereof being sold to the Best Foods, Inc., at San Francisco, California. Approximately 40% of the

cottonseed oil purchased by the Best Foods, Inc., at its San Francisco plant is purchased from the company. After the oil is obtained by the Best Foods, Inc., it is by them winterized, hydrogenated, bleached, deodorized and otherwise treated, and is then used as an ingredient in oleomargarine (a butter substitute), and mayonnaise. Approximately one-third of the oleomargarine and mayonnaise produced by the Best Foods, Inc., is shipped in interstate commerce. The Best Foods, Inc., does not keep segregated the oil purchased from the company and it may be mixed with other cottonseed oil of the same quality purchased from others. The "soap stock" is sold to firms in California; during the period here involved, a number of tank cars of "soap stock" was, by the purchasers thereof, shipped in interstate commerce. During the period from July 8, 1941, to September 28, 1941, the company at its Chowchilla plant processed flaxseed consisting of the operations described in subparagraph (a), (e) and (ee) * * * hereof and made analyses of the seed, oil and cake. None of the plaintiffs herein except Earl Garner makes any claim for overtime compensation in connection with the flaxseed operations."

The plaintiffs, Earl Garner and J. Tilden Abram, were employed as chief chemist and assistant chemist respectively. Their duties were divided between working in the laboratory, located in a portion of a building known as the refinery, which was a building separate and apart from the "mill" where the crushing operations, that is, the preparation and manufacture of cottonseed for the market were conducted, and working in and about the refinery in connection with the refining of the crude oil, doing some of the manual work and loading tank cars whenever necessary. The work in the laboratory consisted of analyzing the crude oil from the Chowchilla, Bakersfield and the Interstate Company plants. The tests were considered routine operations. The purposes of these tests were to ascertain the quality and oil and protein content of the cottonseed oil and cottonseed by-product. Earl Garner performed substantially the same work as did Abram, save in a lesser degree, except that Garner supervised the activities. The latter also analyzed cottonseed products and fertilizer during the dormant season, and from July 8, 1941, to September 28, 1941, he analyzed flaxseed, flaxseed oil and meal. George E. Garner and Homer W. Blackwell were employed by the company from October 25, 1940, to July 1, 1941, and from October 25, 1941, to January 29, 1942, to execute certain duties, the performance of which related to the agitation and spraying of the oil with sodium hydroxide and the heating thereof, following its transmission from the press room into tanks located in a small adjacent building called the refinery. During this treatment the oil is then pumped off and placed in tanks adjoining the mill near the spur railroad track ready for shipment. By this operation, free fatty acids, gum, and coloring matter sink to the bottom of the tanks, and this substance is sold as soap stock. The above work was performed under the supervision of Earl Garner. George Garner was also engaged as a truck driver, hauling trash and general work about the mill from February 3, 1939, to May 17, 1940. Richard Ladda was employed as janitor in the mill and mill office. All the work for which overtime compensation is claimed was performed while the mill was in operation crushing cottonseed. "During the work week ending October 4, 1940, J. H. Holmes was engaged in unloading cottonseed shipped to the company by rail, which cottonseed was processed at the Chowchilla plant during the crushing season commencing October 5, 1940. The work of J. H. Holmes 'in press room' was performed while the mill was in operation in crushing cottonseed and admittedly is exempt from the hours provision of the Act, and his work 'construction work on fertilizer plant' admittedly is not covered by the hours provision of the Act and no claim is made therefor." Fred E. Steele, B. R. Andrews, Linn D. Hopkins, Roy Russelle and John Leo Lucky were all engaged in "machinery repairs in mill." This activity consisted of "cleaning, repairing and putting in shape the machinery in the mill for the processing of cottonseed during the crushing season next following the time such work was done. Such work was performed while the mill was not engaged in crushing cottonseed." However, a variation is to be noted in the activities of each of the employees herein, other than work which they had in common. From April 16, 1939, to July 7, 1939, Fred Steele was engaged in grinding and making meal into pellets in excess of 20 hours of the 42 hours per week. Additional work performed by B. R. Andrews is admittedly exempt from the Act. Roy Russelle's activity described as " 'moving linters on linter yard' was in changing ele-

vators so as to make first cut linter machines operate as second cut linter machines." His work, described as "Construction of planting seed warehouse", is admittedly "* * * not covered by the hours provision of the Act and no claim is made therefor." G. T. Snider's duties, described as "moving linters on linter yard," was actually in changing elevators so as to make first cut linter machines operate as second cut linter machines. He was also engaged in machinery repairs and putting in shape the machinery in the mill for the processing of cottonseed during the crushing season next following the time this work was done. Such operations were performed in the interim of the dormant season.

"Beginning in 1941, the company on occasions mixed fertilizer, the principal ingredient of which was manure from adjacent feed yards. None of the fertilizer was shipped in interstate commerce, and all thereof was sold in and consumed in the State of California." Inasmuch as the plaintiffs collectively were not employed in the same capacity, their claims will be determined separately. Consideration of the primary issues will be preceded by a disposition of the problem involving interstate commerce.

■ Section 207 (a) imposes upon the employer a duty to pay overtime compensation for work performed in excess of the prescribed maximum hours, payable to "any of his employees who is engaged * * * in the production of goods for commerce." Section 203(j) provides that "* * * for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, * * * handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638, is the first Supreme Court decision construing the commerce phase of the Act as reflected by the above quoted provisions. The criterion, enunciated by Justice Frankfurter, directing the disposition of similar controversies, was commendably flexible and entirely compatible with the spirit as well as the language of the Act. Therein he said: "Since the scope of the Act is not coextensive with the limits of the power of Congress over commerce, the question remains whether these employees fall within the statutory definition of employees 'engaged in commerce or in the production of goods for commerce', construed as the provision must be in the context of the history of federal absorption of governmental authority over industrial enterprise. In this task of construction, we are without the aid afforded by a preliminary administrative process for determining whether the particular situation is within the regulated area. Unlike the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and the National Labor Relations Act [29 U.S.C.A. § 151 et seq.] and other legislation, the Fair Labor Standards Act puts upon the courts the independent responsibility of applying ad hoc the general terms of the statute to an infinite variety of complicated industrial situations. Our problem is, of course, one of drawing lines. But it is not at all a problem in mensuration. There are no fixed points, though lines are to be drawn. The real question is how the lines are to be drawn—what are the relevant considerations in placing the line here rather than there. To that end we have tried to state with candor the larger considerations of national policy, legislative history, and administrative practicalities that underlie the variations in the terms of Congressional commercial regulatory measures and which therefore should govern their judicial construction." The policies expressed and the facts of the particular situation become ultimate deciding factors. "* * * the provisions of the Act expressly make its application dependent upon the character of the employees' activities. And, in any event, to the extent that his employees are 'engaged in commerce or in the production of goods for commerce,' the employer is himself so engaged. Nor can we find in the Act, * * *, any requirement that employees must themselves participate in the physical process of the making of the goods before they can be regarded as engaged in their production. Such a construction erases the final clause of sec. 3(j) which includes employees engaged 'in any process or occupation necessary to the production' and thereby does not limit the scope of the statute to the preceding clause which deals with employees 'in any other manner working on such goods.'" The facts stipulated to by the parties establish certain features which this court has difficulty in distinguishing, in principle, from the recent case of Warren-Bradshaw Drilling Co. v. Hall, et al., November 9, 1942, 63 S.Ct. 125, 126, 87 L.Ed. ——, which de-

cision cites the Kirschbaum opinion supra. These cases are authority for the conclusion that the plaintiffs herein were engaged "* * * in any process or occupation necessary to the production * * *" of goods for interstate commerce.

■■■ With the exception of the hulls, fertilizer and mixed feed produced at the plant, all or a substantial part of the defendant's products, and in connection with which the plaintiffs occupied a position necessary to their production, were shipped directly or indirectly in interstate commerce. "A substantial part of the linters, cottonseed meal and cake was sold in interstate commerce." Practically all of 200 to 300 tankcars of cottonseed oil per annum were sold to a concern engaged in interstate shipments and such sale constituted approximately 40% of the buyer's total purchase. After the oil is purchased from the defendant and other producers, it is mixed, treated and used as an ingredient in the preparation of oleomargarine and mayonnaise. Almost one-third of these food substances are destined to points outside the state from which they are shipped. "A number of tankcars of 'soap stock' were shipped in interstate commerce by purchasers thereof," also. "The evidence supports the finding that some of the oil produced ultimately found its way into interstate commerce." Warren-Bradshaw Drilling Co., supra. If not by analogy, then more so by the facts, should the plaintiffs here be as much entitled to the benefits of the Act as the plaintiffs in the Warren-Bradshaw case, at least insofar as interstate commerce is concerned. The process or occupation in which plaintiffs were engaged not only resulted in goods finding their way into interstate shipments by sale to others, but a substantial part of the products themselves were shipped in interstate commerce by the defendant. The "tie" between the activities of the claimants in the present case, is as "close and immediate" as the activities of the claimants in the Warren-Bradshaw case. "The Act extends at least to the employer who expects goods to move in interstate commerce. * * * Assuming that such expectation, or a reasonable basis therefor, was necessary on petitioner's part before the application of the Act to petitioner, it is here present." Warren-Bradshaw Drilling Co. v. Hall et al., supra. In Walling v. Jacksonville Paper Co., January 18, 1943, 63 S.Ct. 332, 335, 87 L.Ed. ——, the sole issue was whether the Act applied to employees at the seven other branch houses of the employer, which, though constantly receiving merchandise on interstate shipments and distributing it to their customers, do not ship or deliver any of it across state lines. In response to the contention that any pause at the warehouses is sufficient to deprive the remainder of the journey of its interstate status, Mr. Justice Douglas said in behalf of the court, "It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce. There is no indication (apart from the exemptions contained in § 13) that, once the goods entered the channels of interstate commerce, Congress stopped short of control over the entire movement of them until their interstate journey was ended." A difference in the factual situation of the cases cited, does not escape the attention of this court; however, the general policy to be followed is identical. "* * * in determining what constitutes 'commerce' or 'engaged in commerce' we are guided by practical considerations." Overstreet et al. v. North Shore Corp., February 1, 1943, 63 S.Ct. 494, 496, 87 L.Ed. ——. The defendant earnestly asserts, "The plaintiffs here claiming for overtime compensation * * * are faced with a two pronged dilemma. If by such work these employees were not engaged in processing cottonseed then nothing was produced for or moved in interstate commerce. On the other hand if they were engaged in the production of goods for commerce, the only goods possibly to be produced 'in the processing of cottonseed' which necessarily means that their employer, defendant herein, was likewise so engaged and therefore exempt under the express provision of section 7(c) of the Act." The premise upon which the defendant predicates its conclusion is supported neither by the language nor the interpretation of the Act. Whether or not the character of the claimants' occupation is that of processing cottonseed pursuant to the exemption 7(c) of the Act, is in no way determinative of the interstate commerce phase of their employment. A test of one is not a test of the other. This may be exemplified by a chain of events commencing with the activities of an employee and ending with the interstate destination of a product. An intermediate link in the chain is the industry processing cottonseed, as defined by the Act, serving as a channel

between the origin and termination of the enterprise. It would be, indeed, anomalous if not illogical to deny the first employee any benefits merely because an intermediate link is specifically exempt, although all the links are inseparable to the entire chain. Among the activities of an operation may be included the activity of "processing cottonseed" within the exemption of 7(c). Whether all or any of the plaintiffs are within this exemption will be determined hereafter. However, it is the opinion of this court that all of the plaintiffs were engaged in a process or occupation necessary to the production of goods for commerce.

The pertinent portion of section 207(c), U.S.C.A., Title 29, declares: "In the case of an employer engaged * * * in the processing of cottonseed * * *, the provisions of subsection (a) * * * shall not apply to his employees in any place of employment where he is so engaged; * * *." " * * * It is elementary * * * that the Act is remedial and * * * persons claiming to come within exemptions therein must bring themselves within both the letter and the spirit of the exceptions, which are subject to a strict construction. Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 56." Consolidated Timber Co. v. Womack, 9 Cir., 132 F.2d 101, 106; Abram v. San Joaquin Cotton Oil Co., D.C., 46 F.Supp. 969. Resolved into a categorical question: Do the activities of each of the plaintiffs herein constitute "processing of cottonseed", where the employer is so engaged, within the meaning of section 7(c) of the Act? Several general observations are appropriate, preliminary to this examination. "The meaning of the statute must in the first instance at least be sought in its language, and if that is plain * * * the sole function of the court is to enforce it [citing cases]. If the statutory meaning is clear, there is, of course, no occasion to resort to rules of construction [citing cases]. In Thompson v. Terminal Shares, Inc., 8 Cir., 104 F.2d 1, 8, we said: ' "A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute, is not within the statute, unless it be within the intention of the makers." People v. Utica Ins. Co., 15 Johns., N.Y., 358, 381, 8 Am.Dec. 243; Territory of Hawaii v. Mankichi, 190 U.S. 197, 212, 23 S.Ct. 787, 47 L.Ed. 1016; Barrett v. Van Pelt, 268 U.S. 85, 90, 91, 45 S.Ct. 437, 69 L.Ed. 857.' In Heydenfeldt v. Daney Gold [& Silver] Min. Co., 93 U.S. 634, 638, 23 L.Ed. 995, it is said: 'If a literal interpretation of any part of it (a statute) would operate unjustly, or lead to absurd results and be contrary to the evident meaning of the Act taken as a whole, it will be rejected; and there is no better way of discovering the true meaning of a law when there are expressions in it which are rendered ambiguous by their connection with other clauses, than by considering the necessity for it, and the causes which induced the Legislature to pass it.' * * *." Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 55. The provision of the Act (7) (c), exempting the "processing of cottonseed" "where [the employer] is so engaged", fails to define what activities processing embraces, or what the term "where [the employer] is so engaged" purports to be. "In ascertaining the meaning of a term, we may resort to any authoritative source of information." Fleming v. Hawkeye Pearl Button Co., supra. "The interpretations promulgated by the Administrator of the Wage and Hour Division in the Department of Labor, although not binding on the court, are entitled to great weight. United States v. American Trucking Ass'ns, 310 U.S. 534-539, 60 S.Ct. 1059, 84 L.Ed. 1345. * * *" Jordan v. Stark Bros. Nurseries & Orchards Co., D.C., 45 F.Supp. 769, 770; "While not binding on the court, the interpretation placed on this statute by the Wage and Hour Division charged with administration of the act is given serious consideration." Abram v. San Joaquin Cotton Oil Co., D.C., 46 F.Supp. 969, 972. In United States v. American Trucking Associations, supra [310 U.S. 534, 60 S.Ct. 1067, 84 L.Ed. 1345], the court stated: "* * * In any case such interpretations are entitled to great weight. This is peculiarly true here where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" The interpretation by the Wage and Hour Division of the United States Department of Labor, of "Processing of Cottonseed," declares "This term includes cleaning and removing hulls and linters from the cottonseed, extracting oil

therefrom and making cottonseed cake or meal. These operations may be performed simultaneously or consecutively, and one employer may perform all of them or only some of them. In any event, such operations are outside the purview of the over-time provisions. The refining of cotton-seed oil, however, is not included in this exemption." Interpretative Bulletin No. 14, section 17. Significantly, none of the plaintiffs herein claiming benefits of the Act, were directly engaged in any opera-tion adverted to in section 17 of Inter-pretative Bulletin, supra. Their activities were either without the exemption of 7(c), or were indirectly associated with the processing of cottonseed, as defined by the Administrator. The extent of the cover-age of section (7) (c) must be ascertained in determining whether the activities of the claimants are exempt. Section 7(c) provides inter alia, ad hoc: "* * * the provisions of subsection (a) * * * shall not apply to his employees in any place of employment where he· [the em-ployer] is so engaged, * * *." The Wage and Hour Division of the Depart-ment of Labor, construed the preceding provision of the Act in its letter of July 9, 1941, appended to the defendant's brief: Therein the Administrator said: "Section 7(c) provides that in the case of an em-ployer engaged in processing cottonseed the overtime provision shall not apply to his employees 'in any place of employment where he is so engaged.' The term, 'proc-essing of cottonseed' is descriptive of an industry, to wit, that industry which is en-gaged in producing cottonseed oil and the byproducts of the oil making operations, i. e., cake and meal. The exemption thus granted to cottonseed processing differs from that granted in the same section of the Act to certain operations upon live-stock. The latter exemption appears lim-ited to certain particular operations, since section 7(c) does not use any term descrip-tive of the meat packing industry, but uses only words describing certain particu-lar operations in such industry. With this distinction in mind it appears to us that all employees working in a plant engaged in processing cottonseed are within the ex-emption, while this would not be true of all employees working in a plant engaged in handling, slaughtering or dressing live-stock. In the latter case only the em-ployees engaged in the enumerated op-erations or in operations that are an inte-gral part thereof would be exempt. It should be noted that even as far as the cottonseed mill is concerned, the exemption applies to the watchmen only if the mill is engaged exclusively in processing cotton-seed and in doing nothing else. The opin-ion expressed in the preceding paragraph does not apply to employees working in the cottonseed mill during the dead season. Section 7(c) specifically states that the ex-emption shall apply in any place of employ-ment where the employer is 'so engaged' (in processing cottonseed). Both the lan-guage and the reason for the exemption make it clear that employees employed dur-ing the dead season are not exempt." The legislative intent lends support to the view expressed in the Administrator's letter, su-pra. By analogy, to an inquiry propound-ed with reference to the processing of sugar, during seasonal operations, and exempt under 7(b) (3) and (c). The Con-gressional discourses between Senators Overton and Thomas were indicative of an intent to distinguish between industries active only during seasonal operations and industries engaged in year around produc-tion.

■ Congressional Record — Senate (June 14, 1938) Page 9162. "It is true, at least generally, that statements made in debate cannot be used as aids to the con-struction of a statute. But the fact that throughout the consideration of this legisla-tion there was common agreement in the debate as to the great purpose of the act may properly be considered in determining what that purpose was and what were the evils sought to be remedied." Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 650, 51 S.Ct. 587, 591, 75 L.Ed. 1324, 79 A.L.R. 1191. While the discussion con-cerned section 7(b) (3), relating to active seasonal periods of operation, emphasis was upon the industry in its entirety, in de-termining the application of the Act to a specific situation; especially when the sev-eral functions are continuous and simul-taneous, as in the present case. A distinc-tion is recognized in the continuity and simultaneity of the cottonseed operations and between the active and dormant season of the industry, by the Wage and Hour Di-vision. In his opinion letter the Solicitor for the Department explains: "We take it that the case you present is one where during certain weeks of the year the mill is engaged simply in grinding cake into meal sometime after the cake was produced and that the cake is not ground as part

of a continuous operation starting with the compressing of the seed. In our view, the term 'processing of cottonseed' as used in section 7(c) does not include the grinding of cake under such circumstances; it includes the grinding of cake only where it is done immediately after the seed has been compressed. Since that is the case, and since the mill here is not engaged in any 'processing of cottonseed' at all during the workweeks about which you inquire, there is no basis for considering the exemption applicable." Labor Law Service, (Fair Labor Standards Act—New Matter) section 33,120, p. 33,091. (3/9/42) "* * * As you know, section 7(c) provides that in the case of an employer engaged in processing cottonseed, the overtime provisions shall not apply to his employees in any place of employment where he is so engaged. Because of the language of the statute and its legislative history, we have consistently stated that the exemption may be taken only during the time that the establishment is actually engaged in processing cottonseed; that is, the exemption may not be taken during the dead season * * *." Labor Law Service, (Fair Labor Standards Act—New Matter) section 33,121, p. 33,091. 3/9/42. "The determination as to whether all employees of the employer who are working in the establishment are included in the exemption or whether the exemption applies to only such employees as perform the operations described in the section must be made in the light of the legislative history of section 7(c).

The Congressional debates show that the purpose of this section was to relieve processors of seasonal agricultural commodities from the hour provisions of the Act so as to enable them more easily to conduct their operations during the peak seasons. It is our opinion, therefore, that only the employees who perform the operations described in section 7(c) or who perform operations that are so closely associated therewith that they cannot be segregated for practical purposes, and whose work is also controlled by the irregular movement of commodities into the establishment, are covered by the exemption * * *." Interpretative Bulletin No. 14, section 23(a), Wage and Hour Division, United States Department of Labor. The ensuing distinction in section 23(a) supra, relating to employees in separate departments of an industry, does not apply to the

processing of cottonseed, as it does to some other industries, because such application appears unwarranted from the language of the Act. This, in view of the Congressional purpose of the exemption to relieve industries actively engaged only certain periods of the year from the restrictions imposed by section 7(a) of the Act and to expedite seasonal operations wherein labor oppression does not or is not likely to exist. From what has heretofore been declared, a conclusion compatible with the language and purpose of the Act, becomes simplified. Each of the plaintiffs herein engaged in or about the defendant's Chowchilla plant, during the active season of processing cottonseed, is within the purview of the exemption, section 7(c) of the Fair Labor Standards Act and are not entitled to the benefits thereof. They are:

J. Tilden Abram,

Earl Garner, except as otherwise provided,

George E. Garner, except as otherwise indicated,

Richard Ladda,

J. H. Holmes, (owing to the proximity of his activities to the seasonal operation of the plant),

Charles Mortimer Randall,

Homer W. Blackwell, except as otherwise provided.

Accordingly, each of the plaintiffs engaged during the dormant season in and about the defendant's plant while operations were inactive is not exempt from the benefits of section 7(a) of the Act; except where they expressly admit such exemption. They are:

Earl Garner, engaged during the dormant season, analyzing cottonseed products and fertilizer, a total of 178 hours,

George E. Garner, engaged in work described as "truck driver, hauling trash and general work about mill yard", for the periods from April 16, 1939, to October 4, 1939, inclusive, and from May 11, 1940, to May 17, 1940, inclusive,

Fred E. Steele, engaged in work described as "machinery repairs in mill", and for the period from April 16, 1939, to July 7, 1939, during which time he was "grinding meal and making meal into pellets",

B. R. Andrews, whose work is described as "machinery repairs in mill", from July 11, 1941, to September 19, 1941,

Linn D. Hopkins, whose work is described as "machinery repairs in mill", from July 4, 1941, to September 19, 1941,

Roy Russelle, whose work is described as "machinery repairs in mill", from July 4, 1941, to September 19, 1941,

John Leo Lucky, whose work is described as "machinery repairs in mill", from July 11, 1941, to September 19, 1941,

G. T. Snider, whose work is described as "moving linters on linter yard" and "machinery repairs in mill", from July 4, 1941, to September 19, 1941,

Homer W. Blackwell, whose work related to oil cleansing, for the periods from April 16, 1939, to October 4, 1939, inclusive, and from May 11, 1940, to September 6, 1940, inclusive.

While the treatment of the oil crushed from the cottonseed, may be designated as refining in a broad sense, yet the operation is more accurately described as a "cleansing process" in that the result sought to be obtained, was incomplete until the oil was sold and converted into a consumable state. However, assuming the treatment of the oil was a refining process, in the circumstances of the case the continuity and simultaneity of the operation, as indicated above, would not relieve the employee from the exemption. The defendant contends that Earl Garner's activities consisting of the analysis of flaxseed and its by-products, during seasonal operations, preclude him from claiming compensation for maximum hours under section 7(a) of the Act, in that the exemption of section 7(c) is effective.

In Abram v. San Joaquin Cotton Oil Co., D.C., 46 F.Supp. 969, this court held the exemption in section 213(a)(10), U.S.C.A.Title 29, inapplicable. Section 7(c) of the Act, on the other hand, declares: " * * * in the case of an employer engaged * * * in the first processing, within the area of production (as defined by the Administrator), of any agricultural or horticultural commodity during seasonal operations, * * * the provisions of subsection (a), during a period ·or periods of not more than fourteen workweeks in the aggregate in any calendar year, shall not apply to his employees in any place of employment where he is so engaged." The "first processing" has been defined by the Administrator of the Wage and Hour Division, to include "Hulling; extracting oil from flaxseed

* * *." Interpretative Bulletin, No. 14, section 20, Department of Labor. This construction is reasonable in .view of the explanation advanced. Therein is stated: " * * * the term 'agricultural or horticultural commodity' connotes the commodity as it comes from the farm and before any change is effected in its natural state * * *." The ensuing paragraph of the same section declares thus: "as set forth above, 'first processing' connotes the first change in the form of the raw materials * * *." In the present case the record reveals and it is alleged that the defendant " * * * operated its mill at its Chowchilla plant for the purpose of crushing and otherwise manipulating flaxseed and extracting therefrom linseed oil and obtaining by-products during the period from July 8, 1941 to September 28, 1941." "During the period from July 8, 1941, to September 28, 1941, he (Earl Garner) analyzed flaxseed, flaxseed oil and meal * * *." The necessity of determining whether the analysis by Earl Garner is an inseparable part of the "hulling and extracting oil from flaxseed" or "crushing and otherwise manipulating flaxseed," is not presented. The operations herein were seasonal and the activities of Earl Garner were performed during the active season of the plant where the employer was so engaged. The evidence indicates the period of this plaintiff's performance did not exceed fourteen weeks and was not outside the area of production as defined by Fleming v. Farmers Peanut Co., 5 Cir., 128 F.2d 404. Therefore the exemption of 7(c) applies to the activities of Earl Garner in relation to the flaxseed operations.

The final issue submitted is Earl Garner's claim to the benefits conferred by 7(a) of the Act, as said claim concerns his activities in analyzing cottonseed products and fertilizer during the dormant season. Unless this plaintiff was employed in the principal capacity of an executive or administrator, his claim must be allowed. Title 29 U.S.C.A. § 213(a) provides: "The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide executive, administrative * * * capacity * * *." Referred to merely as a guide, the ¦Code of Federal Regulations, Title 29, Chapter V, Part 541, section 541.1 declares: "The term 'employee employed in a bona fide executive * * * capacity' in section

13(a) (1) of the Act shall mean any employee (a) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and (b) who customarily and regularly directs the work of other employees therein, and (c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and (d) who customarily and regularly exercises discretionary powers, and (e) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and (f) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction: Provided, That this [subsection (F)] shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment." The facts upon which this issue is predicated disclose that "Earl Garner was employed continuously during a three year period here involved on a monthly basis. He supervised * * *" the analysis operation of products and the ingredients thereof, received or treated at the plant during various stages of processing and under whose supervision J. Tilden Abram worked. The oil cleansing process, to which work George E. Garner attended, was also under the supervision of Earl Garner. The latter's compensation was on a salary basis of $200 a month, which amount was subsequently advanced to $225 a month. He prepared and maintained a record of the time and payroll account of the employees in his charge, as well as being authorized to at least recommend the disqualification or discharge of a particular employee. In the active season of the plant, the position thus occupied by Earl Garner, as an executive, in the light of the Administrator's definition, is not seriously disputed and a finding that he was so employed would be supported by the evidence. However, the record is devoid of any evidence that these executive functions were exercised during the dormant season when the plant was closed. Certainly his primary duty did not consist of management of a subdivision of the establishment when it was inactive, nor could he suggest or recommend "as to the hiring or firing and as to advancement or promotion or any other change of status of the other employees" where and when none were present. Rather, his primary duty was comprised of the analysis of cottonseed products and fertilizer. Numerous conflicting inferences may arise from the fact that his monthly remuneration was the same throughout the year. That this compensation exceeded the figure designated by the Administrator for executives, is not controlling. Devoe v. Atlanta Paper Co., D.C., 40 F.Supp. 284; Rosenthal v. Atkinson, D.C., 43 F.Supp. 96, where in each case the employee received less than the amount prescribed for executive or administrative employees. The court in each instance held this to be no barrier to a classification as an executive. "The fact that an executive may work for less than $30 per week or even $1 a year does not alter the fact that he is an executive." Devoe v. Atlanta Paper Co., supra [40 F.Supp. 286]. The converse of the rule is equally applicable in the principal case. In conformity with the liberal construction of the Act by the courts, inferences favorable to this plaintiff must be so resolved and adopted. "A rule of strict construction should be applied in determining whether an employer comes within one of the exemptions contained in the Act." Lorenzetti v. American Trust Co., D.C., 45 F.Supp. 128, 139; Abram v. San Joaquin Cotton Oil Co., supra. The products analyzed were ultimately destined into intrastate and interstate commerce. While all the fertilizer was sold and consumed in California, a substantial portion of the cottonseed products were shipped in interstate commerce. The time allotted by the activity to each of the products was neither alleged nor proven. In such circumstances, "where an employee is engaged both in interstate and intrastate commerce, he is for the purposes of the Act engaged in interstate commerce." Lorenzetti v. American Trust Co., supra, citing Fleming v. Atlantic Co., D.C., 40 F.Supp. 654, 657. Therefore, the defendant's contention that Earl Garner would be barred because of the intrastate character of the activities is untenable.

In conformity with this court's opinion in Abram v. San Joaquin Cotton Oil Co., supra, the defense of the statute of limitations in bar of the plaintiffs' claims, is without merit, and therefore denied.

Plaintiff will prepare findings of fact and conclusions of law in accordance with this opinion. Plaintiffs' attorneys will be allowed $100. Title 29 U.S.C.A. § 216(b). Each party will pay its own costs.