MANEJA ET AL. *v.* WAIALUA AGRICULTURAL
CO., LTD.

NO. 357.

Argued March 30, 1955.—Decided May 23, 1955.

*Richard Gladstein* argued the cause for Maneja et al. With him on the brief was *Norman Leonard*.

By invitation of the Court, 348 U. S. 870, *Bessie Margolin* argued the cause for the Secretary of Labor, as

*amicus curiae,* urging reversal. With her on the brief were *Solicitor General Sobeloff, Stuart Rothman* and *Harold S. Saxe.*

*Rufus G. Poole* argued the cause for the Waialua Agricultural Co., Ltd. With him on the brief were *Livingston Jenks, Milton C. Denbo* and *Philip Levy.*

*Paul E. Mathias* filed a brief for the American Farm Bureau Federation, as *amicus curiae,* supporting the Waialua Agricultural Co., Ltd.

MR. JUSTICE CLARK delivered the opinion of the Court.

This case involves, primarily, the coverage of the agriculture exemption [1] of the Fair Labor Standards Act of 1938, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.* The petitioners are 31 employees of respondent corporation,[2] which is engaged in the growing, harvesting and processing of sugar cane at its plantation in the Territory of Hawaii. Respondent seeks a declaratory judgment that its operations are exempt from the overtime provisions of the Act, while the petitioners, through a counterclaim under § 16 (b) of the Act, seek to recover unpaid overtime compensation. The action pertains only to work performed between November 20, 1946, and September 14, 1947.

Waialua owns and operates what might be called the agricultural analogue of the modern industrial assembly line. On its plantation, consisting of some ten thousand acres of land, it cultivates sugar cane which it processes into raw sugar and molasses. It utilizes the year-round growing season to produce a steady supply of cane and employs in its operations over a thousand persons,

---

[1] "SEC. 13 (a). The provisions . . . shall not apply with respect to . . . (6) any employee employed in agriculture."

[2] Forty-two employees were originally involved, but 11 sustained adverse decisions in the District Court and did not appeal.

many at specialized tasks. Some move from field to field preparing the soil, fertilizing, planting seed or cultivating. Others attend to the irrigation of the fields. As the cane crop matures, crews of employees move in with mechanical cane harvesters that cut and throw the cane into railroad cars. The cane is then taken over portable tracks laid into the growing fields to Waialua's mainline railroad, which runs throughout the plantation, and from there skilled railroad workers transport the cane to the processing plant. Freshly cut sugar cane is extremely perishable and must be processed within a few days of harvesting or serious spoilage will result. The processing plant is typical of such modern industrial facilities and is manned by employees specially trained in its operation. It has all of the equipment needed to receive the freshly cut cane from the railroad cars and process it into raw sugar and molasses. Adjacent to the processing plant are warehouses where the raw sugar and molasses are stored preparatory to shipment to the United States.

A tremendous variety of work must be done to keep this enterprise going, and Waialua employs persons versed in each operation. In addition to those employed as indicated above, about a hundred more work in repair shops as mechanics, electricians, welders, carpenters, plumbers and painters. They keep Waialua's highly mechanized enterprise operating, making not only emergency repairs but complete overhauls of the railroad, milling, harvesting and other equipment. Waialua also maintains a plant for the manufacture of concrete products (paving blocks and flumes for irrigation ditches), an electric generating plant in the same building as the mill, and a laboratory for the testing of its soil, water, cane and raw sugar.

In addition to all this, Waialua owns a village where the great majority of its employees live. Known as Waia-

lua Village, it was originally built when housing for the employees was inadequate, and is located on plantation property within the limits of the City of Honolulu. Within the town are several hundred houses and business establishments, all occupied on a rental basis, together with recreational areas and other town facilities. The respondent furnishes all the maintenance work for its village, employing street cleaners, road graders and janitors.

*Proceedings Below.*

The trial judge found that all the employees were outside of the agriculture exemption save those engaged directly in agricultural work in the fields, in loading the freshly cut cane into cane cars, and in hauling the loaded cars to the mainline railroad. Those employees working in the sugar mill were found to be under the special processing provisions of § 7 (c) of the Act. As to the other employees, the court entered judgment for overtime as well as liquidated damages and attorney's fees. 97 F. Supp. 198. The Court of Appeals reversed, believing that "the entire cause was tainted by apparent collusion" because stipulations covered the commerce features of the case. It thought that "agriculture is not commerce, interstate or foreign," and that "[f]ederal regulation of agriculture invades the reserved rights of the states. *United States* v. *Butler,* 297 U. S. 1 . . . . But cf., *Wickard* v. *Filburn,* 317 U. S. 111." It indicated, further, that even if the suit were not collusive, the workers would not be entitled to the relief claimed because all of them came within the agriculture exemption of the Act. 216 F. 2d 466 (1954). Despite this reasoning, the Court of Appeals refused to dismiss petitioners' counterclaim but remanded it to the trial court "for proceedings in accordance with this opinion." We granted certiorari, believing

that the proper administration of the Act requires a resolution of the questions presented. 348 U. S. 870.

We are in full agreement with the parties that the first ground relied upon by the Court of Appeals is incorrect. It is not necessary now to consider the vitality of *United States* v. *Butler, supra,* for that decision expressly reserved the question of whether the regulation of agriculture was within the commerce power,[3] and *Wickard* v. *Filburn, supra,* decided the question in favor of the congressional power. In view of the fact that Waialua exports virtually its entire output for sale throughout the United States, we find ourselves unable to say that the stipulation with respect to the power of Congress was collusive.

## The Scope of the Agriculture Exemption.

Congress exempted agriculture from the terms of the FLSA in broad, inclusive terms:

> SEC. 3. "(f) 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 15 (g) of the Agricultural Marketing Act, as amended), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

---

[3] ". . . the Government does not attempt to uphold the validity of the act on the basis of the commerce clause, which, for the purpose of the present case, may be put aside as irrelevant." 297 U. S., at 64.

The exemption was meant to embrace the whole field of agriculture, and sponsors of the legislation so stated, 81 Cong. Rec. 7648, 7658. This Court also has had occasion to comment on its broad coverage. See *Addison* v. *Holly Hill Co.*, 322 U. S. 607, 612 (1944). Nevertheless, no matter how broad the exemption, it was meant to apply only to agriculture and we are left with the problem of what is and what is not properly included within that term.

From the very beginning of the legislative consideration of the Act, a comprehensive exemption of agricultural labor was a primary consideration of the Congress. Nevertheless, before its final language developed, the agriculture exemption ran the gamut of extensive debates and amendments, each of the latter invariably broadening its scope. Exempting "any person employed in agriculture," its first comprehensive definition declared "farming in all its branches" to be exempt, including "any practices *ordinarily* performed by a farmer as an incident to such farming operations." S. 2475, Calendar No. 905, 75th Cong., 1st Sess. 51. Although this language was described by those in charge of the bill in the Senate as "perhaps, the most comprehensive definition of agriculture which has been included in any one legislative proposal," 81 Cong. Rec. 7648, its coverage was broadened until it became coterminous with the sum of those activities necessary in the cultivation of crops, their harvesting, and their "preparation for market, delivery to storage or to market or to carriers for transportation to market." Our main problem is to determine which activities of Waialua come within this definition, thus exempting the persons so employed from the provisions of the Act.

*The Railroad Workers.*

Waialua's railroad workers not only haul cane from the fields to the processing plant but also transport farming

implements and field laborers on the narrow-gauge rail-
way extending throughout the plantation. For numerous
reasons, we feel that these employees fall within the
comprehensive wording of the agriculture exemption.
Nowhere in the Act was any attempt made to draw a
distinction between large and small farms or between
mechanized and nonmechanized agriculture. In fact,
the very opposite appears, since Congress in 1949 specifi-
cally refused to draw a distinction between large and
small farms similar to the distinctions drawn in the size
of newspapers or telephone companies. See H. R. Rep.
No. 267, 81st Cong., 1st Sess., p. 24. Compare FLSA,
as amended, §§ 13 (a)(8), 13 (a)(11), 13 (a)(15).

In view of this, we cannot hold that merely because
Waialua uses a method ordinarily not associated with
agriculture—a railroad—to transport the cane from the
fields to the mill, it has forfeited its agriculture exemp-
tion. Where a farmer thus uses extraordinary methods,
we must look to the function performed. Certainly no
one would argue that the agriculture exemption did not
apply to farm laborers who took the cane to the plant
in wheelbarrows. There is no reason to construe the
FLSA so as to discourage modernization in performing
this same function.

Furthermore, had Waialua not owned a mill, its trans-
portation activities from field to mill would come squarely
within the agriculture exemptions covering "delivery
to storage or to market or to carriers for transportation
to market." We do not believe the Congress intended
to deprive farmers having their own mills of the exemp-
tion it afforded farmers who do not. In the debate on
the amendment extending exemption to "delivery to
market," its sponsor made clear that auxiliary activity of
the kind here involved would be included within that
term. 81 Cong. Rec. 7888.

Similarly, the exemption clearly covers the transportation of farm implements, supplies and field workers to and from the fields. Being performed "on a farm as an incident to or in conjunction with such farming operations," this activity is a necessary part of the agricultural enterprise.

Although the original administrative interpretation squarely supports our conclusion in regard to such hauling activity,[4] it is insisted that the administrative practice has been to the contrary since *Bowie* v. *Gonzalez*, 117 F. 2d 11 (1941). We have examined the press release relied on and find that it stated only that the exemption "does not apply to sugar mill employees, even if the only cane ground in such a mill is cane grown by the sugar mill owner in his own fields," and made no reference to employees engaged in transporting the cane to the mill.[5] Subsequent statements by the Administrator merely make the coverage of this activity a question of fact to be determined on an *ad hoc* basis.[6] We see no basis for the assertion, therefore, that the administrative practice since 1941 has been to exclude from the exemption the transportation of cane from field to mill. Moreover, *Bowie* itself established no such rule, save with regard to the transportation of sugar cane of independent growers. The judgment left all employees transporting sugar cane grown by the mill company in the exempt status. In the subsequent case of *Calaf* v. *Gonzalez*, 127

---

[4] "If a company has sugar cane fields and also a mill, the transportation of its own sugar cane to the mill seems an incidental practice which is included [within the exemption]." U. S. Dept. of Labor, Wage and Hour Division, Interpretative Bulletin No. 14, p. 9, 35 WHM 351, 356.

[5] Press Release, Wage and Hour Division, Sept. 15, 1941, reported at 35 WHM 355.

[6] Findings and Opinion of Administrator, May 20, 1943, Waialua's brief, pp. 51–52, in proceedings incident to Wage Order, Part 635, for the Sugar and Related Products Industry, 8 Fed. Reg. 7098.

F. 2d 934 (1942), the same Court of Appeals warned that a different problem would be present if the heart of the transportation system and the situs of the employment of workers were located at the plantation. We do not believe that either *Bowie* or *Calaf* is apposite. The factual situation here is that Waialua's transportation system is all either in or contiguous to its fields, save the necessary trackage at the mill to accommodate cane cars arriving from various sections of the plantation. The railroad is used exclusively for the effectuation of the agricultural function of transporting exempt agricultural workers to the fields, together with their equipment and supplies, and hauling freshly cut cane to the processing plant. Without it or some other "haul," the land could not be cultivated and the cane, after harvest, would spoil in the fields and be lost. We believe that under the facts here presented the administrative practice also requires that the railroad employees be classified as within the agriculture exemption.

*The Workers Employed in the Repair Shops.*

By a parity of reasoning, those employees who repair the mechanical implements used in farming are also included within the agriculture exemption. Every farmer, big or little, must keep his farming equipment in proper repair, and the fact that Waialua's size has permitted it to achieve an extraordinary degree of specialization should not deprive it of this exemption. Here, the relatively small number of employees assigned to the repair activities—working only on Waialua's machinery and equipment—indicates that, far from being a farmer who conducts a repair business on the side, Waialua is merely performing a subordinate and necessary task incident to its agricultural operations. Indeed, the very necessity of integrating these tasks with Waialua's main operation—without which the entire farming operation would soon

become hopelessly stalled—is strong reason to consider the repairmen within the exemption. This reasoning, of course, applies only to those employees engaged in the repair of equipment used in performing agricultural functions: tractors, cane loaders, cane cars, and so forth. The repair work on mill equipment is considered under the processing exemption, *infra*.

*The Employees in Waialua's Sugar Processing Plant.*

The legislative history of the FLSA indicates that the mill employees present a borderline case. Indeed, this very question, *i. e.*, whether the grinding of one's own sugar cane comes within the exemption, was posed and left unresolved in the debates, 81 Cong. Rec. 7657–7658. The sponsors of the Act made clear, however, that "a farmer erecting on his farm a factory and manufacturing anything you please, whether something he grows or not, who employs many people to manufacture it, and then ships it in interstate commerce . . . would not make the manufacturing . . . a farming operation." 81 Cong. Rec. 7658. From this and from discussions of other borderline cases, it is clear that we must look to all the facts surrounding a given process or operation to determine whether it is incident to or in conjunction with farming.

In making such a particularized determination, we may consider first the criteria set forth by the Wage-Hour Administrator in 1949, 35 WHM 371, 373. He proposed the following as relevant factors:

(a) The size of the ordinary farming operations. There can be no question here that such operations are substantial, and that Waialua's sugar-raising activities are no mere façade for an otherwise industrial venture.

(b) The type of product resulting from the operation in question. Here the products are raw sugar and molasses. There is some ground for considering these as

strictly agricultural commodities, since the unmilled sugar cane is highly perishable and unmarketable as such. On the other hand, the milling operation transforms sugar cane from its raw and natural state, and there is support in the Senate debates for the view that a process resulting in such a change is more akin to manufacturing than to agriculture. See 81 Cong. Rec. 7659–7660, 7877–7878.

(c) The investment in the processing operation as opposed to the ordinary farming activities. Here the mill accounts for 29% of Waialua's total investment in the plantation.

(d) The time spent in processing and in ordinary farming. Waialua's mill operations account for 23% of the man-hours worked during the year.

(e) The extent to which ordinary farmworkers do processing. There is but slight interchange of workmen. The over-all picture discloses essentially separate working forces for mill operations and for farming.

(f) The degree of separation by the employer between the various operations. The plantation organization calls for separate departments to handle the processing activities and field work.

(g) The degree of industrialization. The mill workers here, as observed in the *Bowie* case, are typical factory workers, and from its external characteristics the milling operation is certainly an industrial venture.

But in making the factual determination, we must keep in mind that the question here presented is a limited one: is the milling operation part of the agricultural venture? If it is agriculture, albeit industrialized and involving highly specialized mechanical tasks, we must hold it to be within the agriculture exemption. Thus we must add to the factors above some consideration of what is ordinarily done by farmers with regard to this type of operation. It is true that the word "ordinarily" appeared in an earlier version of the exemption and was subsequently

stricken, but the inquiry is nonetheless a pertinent one. It has a very direct bearing in determining whether the milling operation is really incident to farming.

Our major domestic sugar-producing areas are in Louisiana, Puerto Rico and Hawaii. Statistics for 1948 reveal that the 5,957 sugar farms in Louisiana have their sugar processed in 47 independent mills and in 12 co-operatives. Marketing Sugarcane in Louisiana (U. S. Dept. Agric. 1949) 1, 23; Agricultural, Manufacturing and Income Statistics for the Domestic Sugar Areas (U. S. Dept. Agric. 1954) 84. While the independent mills own 40% of the cane-producing acreage, there is no indication that these customarily process only the sugar cane grown on their own lands. For the same year, Puerto Rican sugar from 14,772 farms was processed in 35 "centrals." The Marketing of Sugarcane in Puerto Rico (U. S. Dept. Agric. 1950) 2; Agricultural, Manufacturing and Income Statistics for the Domestic Sugar Areas, supra, at 121. Again the practice is not for the individual farmer to grind his own sugar. The statistics for Hawaii disclose only 34 and 30 farms for 1947 and 1948 respectively. But these low figures resulted from a classification which counted only the "plantations." When smaller independent farms were included in the 1951 figures, the number of Hawaiian sugar farms jumped to 786. Agricultural, Manufacturing and Income Statistics for the Domestic Sugar Areas, supra, at 137. In addition, there are some 1,500 or 1,800 small "adherent planters" producing sugar cane in Hawaii. See Hearings before the House Committee on Education and Labor on H. R. 2033, 81st Cong., 1st Sess., p. 1173. According to information furnished by the Sugar Division of the United States Department of Agriculture, there are about twenty-six sugar mills in Hawaii processing cane produced by all these farmers. Ten of these, like Waialua, are engaged exclusively in the processing of their own cane; the re-

maining sixteen process cane grown by others as well as their own.[7] The pertinent ratio, however, is not the proportion of millers who grow their own cane but the percentage of farmers who engage in milling. Thus, while sugar milling by farmers is more prevalent in Hawaii than in the other sugar-producing areas, it is very doubtful that these milling operations can be considered a normal incident to the cultivation of sugar cane, even in the context of the Hawaiian sugar industry.

From a consideration of all the relevant factors, the question would be an extremely close one in gauging whether this milling operation is farming or manufacturing. But we do not stop here. The status under the FLSA of farmers milling their own sugar is influenced by a number of extraneous legislative factors—their position *vis-à-vis* the agriculture exemption may well be *sui generis*. Some time after the inconclusive floor debate on sugar processing, there was included in § 7 (c) a total exemption of this activity from the overtime provisions of the Act. This may well have been considered a satisfactory answer to the difficult problems posed in determining whether sugar processing came within the agriculture exemption. But we cannot be sure of this, because § 7 (c) includes similar exemptions for operations like cotton ginning, which also come within the agriculture exemption if performed by the farmer on his own crops. More significant is the *omission* of sugar milling from the exemption provided by § 13 (a)(10) for various processing operations performed within the area of production.

---

[7] See letter of April 28, 1955, to Stuart Rothman, Solicitor, Department of Labor, from Lawrence Myers, Director, Sugar Division of the Department of Agriculture, as corrected by letter of May 13, 1955, to Stuart Rothman, Solicitor, Department of Labor, from Thomas H. Allen, Acting Director, Sugar Division of the Department of Agriculture. See also Supplemental Brief of the Secretary of Labor, p. 11, n. 4.

This exemption was designed to meet the protests of many legislators who argued that the broad agriculture exemption permitted large farming units to process their own products without subjecting themselves to the terms of the Act, while the small farmer, who did not have the equipment necessary for such processing, had to bear the cost of operations covered by the Act. Section 13 (a)(10) exempted employees "within the area of production . . . engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market." Thus, for example, the cotton farmer without a gin was placed on an equal footing with farmers who ginned their own cotton, since each could have their cotton ginned by employees who were covered by neither the wage nor the hour provisions of the Act. But sugar milling is not included within the "area of production" exemption, since in the course of this processing the sugar cane is changed from its "raw or natural state." See 35 WHM 365. Senator Schwellenbach, one of the most ardent advocates of equalization in the status of large and small farmers, considered this change in the product as marking the dividing line between processing as an agricultural function and processing as a manufacturing operation. See 81 Cong. Rec. 7659–7660, 7877–7879. The "area of production" exemption reflects this dichotomy. Thus all other forms of quasi-industrial processing—ginning, canning, packing, etc.—which might be used as analogies for including sugar milling within the agriculture exemption are repeated in § 13 (a)(10). Congress would not have omitted sugar milling from the "area of production" exemption if it had not concluded that it also fell outside the agriculture exemption. We think that adherence to the congressional scheme requires us to hold that sugar milling is outside the agriculture exemption and that its

exemption from the hours provision by virtue of § 7 (c) marks the outer limit of congressional concession to this type of processing. By so holding, we not only equalize the status of all sugar farmers with regard to FLSA coverage of milling operations on their product, but we equalize the impact of the Act on all sugar mills, those which grind their own cane and those grinding their neighbors' as well.

We note, further, that such an interpretation closes a gap that would otherwise exist in the federal *wage* regulation of persons engaged in producing sugar for interstate commerce. The FLSA clearly reaches those engaged in refining sugar, cf. FLSA § 7 (c), and the Sugar Act provides for reasonable wages for those engaged in the "production, cultivation, or harvesting" of sugar cane. 50 Stat. 909, 61 Stat. 930, 7 U. S. C. § 1131. The latter terminology has been construed to extend to the mainline railroad workers, *e. g.*, 7 CFR, 1941 Supp., § 802.34d, leaving unregulated only the wages of sugar-mill employees—unless, as we hold here, these factory workers are beyond the terms of the agriculture exemption.

Waialua makes much of the fact that the Administrator originally construed the agriculture exemption as covering the grinding of the farmer's own sugar cane. Interpretative Bulletin No. 14, *supra.* The Administrator revised his construction in 1941 to accord with his interpretation of several cases in the First Circuit dealing with the Puerto Rican sugar industry, and from that time he has maintained that sugar milling is not exempt, even if the farmer is engaged exclusively in the milling of his own cane. See Press Release, *supra,* at note 5. The revised construction of the Administrator—and the fact that farmers milling their own sugar cane were covered only by § 7 (c)—were reported to the congressional committees considering amendments to the FLSA. See Hearings before a Subcommittee of the Senate Committee on

Education and Labor on S. 1349, 79th Cong., 1st Sess., pp. 1049–1050; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare on S. 49 *et al.,* 80th Cong., 2d Sess., p. 318; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare on S. 58 *et al.,* 81st Cong., 1st Sess., pp. 973–974; Hearings before the House Committee on Education and Labor on H. R. 2033, 81st Cong., 1st Sess., p. 1166. But when the Act was amended in 1949 Congress did not overrule this interpretation. It provided instead that any "order, regulation, or interpretation of the Administrator" in effect on the effective date of the 1949 amendments "shall remain in effect . . . except to the extent that any such order, regulation, interpretation . . . may be inconsistent with the provisions of this Act . . . ." 63 Stat. 920. We relied on this section in *Alstate Construction Co.* v. *Durkin,* 345 U. S. 13, in upholding a regulation of the Administrator which similarly had been changed, reported to Congress in its revised form, and left unaltered by the 1949 Act. We come to the same conclusion in this case, and hold the Administrator's interpretation unimpaired by the 1949 Amendments. It therefore follows that the employees working in the processing plant are not within the agriculture exemption.

*The Processing Exemption.*

Although the mill workers are not within the agriculture exemption, they are nevertheless exempt from the overtime provisions of the Act. Section 7 (c) specifically provides that the overtime provisions of the Act shall not apply to "an employer engaged in the . . . processing of . . . sugarcane . . . into sugar (but not refined sugar)," and this exemption extends to "employees in any place of employment [where the processing is carried on]." This, we feel, covers the workmen during the proc-

essing season while making emergency repairs in the mill, cleaning the equipment during the week-end shutdown, and performing other tasks closely and intimately connected with the processing operation. Repair work on the mill equipment in Waialua's shops in the mill area is also within the exemption. See 35 WHM 360–361. During the three-month off-season, however, a complete overhaul and reconditioning is given the entire mill equipment and no processing work is performed. Since § 7 (c) on its face covers only those employees who work in the place of employment where the processor *is so engaged,* we cannot extend its coverage to include within the overtime exemption permanent repairs, overhaul and reconditioning during this three-month off-season. See *Heaburg* v. *Independent Oil Mill,* 46 F. Supp. 751; *Abram* v. *San Joaquin Cotton Oil Co.,* 49 F. Supp. 393. Cf. *Mitchell* v. *Stinson,* 217 F. 2d 210, 217 (C. A. 1st Cir.).

*The Waialua Village Workers.*

We now come to those workers employed in the maintenance of Waialua Village. This village seems to be an ordinary town, except for the fact that Waialua performs the usual civic functions. It rents its dwelling houses to employees and others on a purely voluntary basis. In fact, the adjacent Haleiwa Village, not owned by Waialua, houses some of the employees. Under the 1949 Amendments to the Act, the work of the employees in maintaining the town clearly is not covered. 63 Stat. 911, 29 U. S. C. § 203 (j). The question presented in this case, therefore, is of small import in itself. Even so, to come within the coverage of the Act prior to this amendment, the activity of such employees must have a "close and immediate tie with the process of production." *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 525. We do not

believe such a tenuous relation as here established is sufficient. This activity is sufficiently regulated by the requirements of Hawaiian law. Revised Laws of Hawaii, 1945, Title 9, Ch. 75, §§ 4351–4366. Congress made it clear that it intended to "leave local business to the protection of the states," *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 570, and "did not see fit . . . to exhaust its constitutional power over commerce," *10 East 40th St. Bldg.* v. *Callus,* 325 U. S. 578, 579. For these reasons, we believe that the employees working in the maintenance of the village and the repair of the respondent's dwelling houses are not covered by the provisions of the Act.

In view of the state of the record, we are unable to determine the rights of the remaining employees involved in this litigation. We do not have sufficient data to decide whether the employees in the laboratory, the cement products plant and the power plant are within the agriculture or sugar-processing exemption. On remand, the problems arising in those operations—small though they be in the over-all picture—may be decided in the light of the considerations set down in this opinion. Likewise, the trial court may make any necessary reassessment in overtime compensation due employees. The judgment of the Court of Appeals, accordingly, is reversed and the cause is remanded to the District Court for proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BURTON, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN join, concurring in part and dissenting in part.

The Waialua Agricultural Company performs the closely integrated function not merely of growing, harvesting and gathering sugar cane from its fields, but of promptly processing that cumbersome, perishable crop

into transportable, marketable raw sugar and molasses. If not so processed, the cane spoils. The processing, therefore, is as essential to the success of the sugar cane plantation as the growing and harvesting of the cane itself. The question before us is the extent to which the employees of Waialua are exempt from the Fair Labor Standards Act of 1938.

Congress, in so many words, has excluded from the coverage of the Act *"any employee employed in agriculture."* [1] (Italics supplied.) It has clarified this exemption by adding that—

> " 'Agriculture' includes *farming in all its branches* and among other things includes the cultivation and tillage of the soil . . . the production, cultivation, *growing, and harvesting of any agricultural or horticultural commodities . . . and any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."* [2] (Italics supplied.)

In my view, the above definition includes all of the operations of the Waialua Agricultural Company.[3] It is difficult to conceive of terms covering them more adequately. Concededly, the company is a "farmer," and each of the practices involved here readily can be conceived of as being performed by it on its farm as an incident to or in conjunction with growing, harvesting and preparing its sugar cane for market or for delivery to carriers for transportation to market.

---

[1] § 13 (a)(6), 52 Stat. 1067, 29 U. S. C. § 213 (a)(6).

[2] § 3 (f), 52 Stat. 1060, 29 U. S. C. § 203 (f).

[3] Except the maintenance of Waialua Village, which, for other reasons, as the Court explains, does not come under the coverage of the Act.

The Court goes far toward adopting the above view. By applying the agricultural exemption to Waialua's employees who grow or harvest the sugar cane, and to those who deliver the cane to the processing mill, the Court completely relieves Waialua of the wage and hour requirements of the Act in relation to those employees. On the other hand, the Court declines to apply the agricultural exemption to Waialua's processing employees. The consequence of this is minimized by two factors. First, the resulting subjection of Waialua to the minimum wage requirements of the Act adds no burden because Waialua, of its own accord, pays its processing employees more than the required minimum. Secondly, any burden due to the resulting subjection of Waialua to the statutory 40-hour week, with increased pay for overtime, is not great, because § 7 (c)[4] specifically grants exemption from such regulation to "employees in any place of employment where" the employer is engaged in processing sugar cane into raw sugar or syrup.

However, the processing exemption, under § 7 (c), is not the full equivalent of the agricultural exemption under §§ 13 (a)(6) and 3 (f). The exemption under § 7 (c) is limited to the overtime provisions of the Act and does not extend to the minimum wage provisions. It is construed to cover only tasks that are "closely and intimately connected" with the actual processing of sugar cane in a mill, whereas the agricultural exemption is not so restricted. The Court makes this clear. Section 7 (c) is held by it not to reach services performed by Waialua's processing employees in the mill during the "off season" when no cane is actually being processed there. Still other areas of uncertainty appear where the Court requires further findings as to the work done in the laboratory, the concrete products plant and the power plant

---

[4] 52 Stat. 1063, 29 U. S. C. § 207 (c).

before determining the status of employees engaged in those operations.[5]

If the agricultural exemption be given the broad application to which I believe it entitled, no line need be drawn between processing and other agricultural activities. Each of the above activities would be exempt because each is "incident to or [is performed] in conjunction with" the agricultural operation of growing, harvesting, preparing and delivering the cane to market.

The Court recognizes that the large size of Waialua's plantation makes necessary the specialization of labor incidental to its sugar cane production and marketing. Mere size and mechanization of Waialua's farming operations are not, in themselves, grounds for excluding any of its employees from the agricultural exemption. As I see it, the statutory definition of agriculture describes a major activity which lies beyond the outer limits of the Fair Labor Standards Act. "Agriculture" is not an exception carved out of the jurisdiction of the Act. Congress never proposed to apply the Act to agriculture. To any extent that the Act impinges upon agricultural

---

[5] In the laboratory, Waialua employs, in a separate building, 14 chemists, testers and samplers who analyze cane leaf, juice, fiber and ash, raw sugar and molasses, water used in all operations, etc., so as to have all operations controlled by scientific methods. In the concrete products plant, it employs, in a separate building, four to ten men primarily making irrigation flumes and water supply pipe. Other products include concrete blocks, footings and sidewalk slabs required on the plantation. Cement and other materials used in making these products are purchased off the plantation. For the power plant, the "bagasse," or cane fiber remaining after the extraction of its juice, supplies fuel. Waialua burns it to produce steam which drives mill machinery, heats sugar juice and generates electric power. The electric power, in turn, serves various operations on the plantation. The integrated nature of these operations emphasizes the propriety and practicality of the blanket agricultural exemption in relation to them. It demonstrates also the difficulty of drawing lines between such naturally related operations.

activities, those impingements are themselves exceptions to the general freedom that characterizes agricultural employment.

The legislative history supports an all-inclusive, rather than a restrictive, interpretation of the word "agriculture" as used here. When Senate Bill 2475, which became the Fair Labor Standards Act, was reported favorably by the Senate Committee on Education and Labor, it exempted "any person employed in agriculture." It provided that as "used in this Act, the term 'agriculture' includes *farming in all its branches* and . . . any practices *ordinarily* performed by a farmer as an incident to such farming operations." (Italics supplied.) *Id.*, Calendar No. 905, 75th Cong., 1st Sess. 51. Congress proposed thereby to exempt "persons engaged in agriculture *and such processing of agricultural commodities* as is *ordinarily* performed by farmers as an incident of farm operations." (Italics supplied.) S. Rep. No. 884, 75th Cong., 1st Sess. 6. The exemption was thus expressly made applicable at least to the *ordinary processing* of agricultural commodities while converting them from their natural state to a marketable form.

In the ensuing debate, attention was directed specifically to sugar cane. In answer to whether syrup mills, operated on sugar cane plantations, would be exempt, the Chairman of the Senate Committee on Education and Labor stated that "If . . . it is a practice *not ordinarily* performed by a farmer as incident to his farming operations . . . [it] would *not* come under the definition." (Italics supplied.) 81 Cong. Rec. 7657. However, this restriction of the agricultural exemption significantly disappeared when the word "ordinarily" was intentionally stricken out of the definition of agriculture. H. R. Rep. No. 1452, 75th Cong., 1st Sess. 11. In its final stage, "agriculture" became substantially all-inclusive. It covered "any practices performed by a farmer or on a farm

as an incident to such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." S. 2475, Union Calendar No. 804, 75th Cong., 3d Sess. 50.

Emphasis thus was shifted from *ordinary* practices incident to farming operations to *all* practices incident to farming operations, including those incident to the preparation or delivery of agricultural products to storage or to market. Operations, such as those of a shirt factory on a cotton farm, are said to be excluded from the agricultural exemption, not because they are not ordinarily operated by farmers, but because they are neither incident to farming operations nor appropriate to the preparation of a farm product for its initial market. Accordingly, the essential inquiry in the instant case is whether Waialua's processing of sugar cane is incident to farming operations, including those necessary or appropriate to prepare the cane product for storage or for its market. The answer should be that harvested sugar cane is so highly perishable that it must be processed promptly in order to be either stored or marketed. It naturally follows, therefore, that such processing, done by a farmer on a farm, should be recognized as "agriculture" equally with the growing and harvesting of the crop.

Emphasizing this view, in 1939, the Department of Labor issued Interpretative Bulletin No. 14. It then said unequivocally that the words "preparation for market" included the processing of sugar cane into raw sugar and molasses. It classified that operation with cotton ginning and the packing or canning of other agricultural commodities. *Id.*, § 10 (b), 35 Wage and Hour Man. 351, 355.[6] Being substantially contemporaneous with the

---

[6] It appears that the Administrator of the Wage and Hour Division later withdrew from that position in deference to a decision in 1941 by the Court of Appeals for the First Circuit in *Bowie* v. *Gonzalez*, 117 F. 2d 11. That court there held that certain processors who

Fair Labor Standards Act of 1938, such an initial interpretation of the statute is entitled to special weight. *United States* v. *American Trucking Assns.,* 310 U. S. 534, 549.

While the Court suggests that § 7 (c) lends support to its conclusion that the agricultural exemption does not apply to processing operations, I believe that the presence of § 7 (c) supports the opposite conclusion. Section 7 (c) was inserted in the bill largely in answer to the argument that the agricultural exemption (in §§ 13 (a)(6) and 3 (f)) would relieve the large processing farmers from the restrictions of the Fair Labor Standards Act and thus help them market their raw sugar or molasses more cheaply than the smaller farmers who would be compelled to employ nonexempt independent processors. Section 7 (c), accordingly, was added to relieve such independent

----

processed sugar cane, *other than their own,* did not come within the agricultural exemption. The Administrator, in concluding that the processing of sugar cane by a farmer on his own farm, in his own plant, also was to be excluded from the agricultural exemption, extended the decision beyond the point at issue. See *Farmers Irrigation Co.* v. *McComb,* 337 U. S. 755, 766–767, n. 15.

I do not attach significance to the failure of Congress to make specific reference to this point in its 1949 amendments. By its savings clause, Congress reserved the issue of the validity of the Administrator's interpretation of the Act. It did this by providing generally that existing interpretations of the Administrator remain in effect but expressly excepting "the extent that any such . . . interpretation . . . may be inconsistent with the provisions of this Act . . . ." 63 Stat. 920. The pendency of the instant litigation at that time was called to the attention of the appropriate Committee of Congress and it was shown that the Administrator had not instituted that suit, or any other, in reliance upon the interpretation now claimed. Hearings before House Committee on Education and Labor on H. R. 2033, 81st Cong., 1st Sess. 1165–1169. To use the 1949 savings clause as confirming the consistency, with the statute, of the Administrator's interpretation is to assume that very consistency in order to establish it.

processors from the overtime requirements of the Fair Labor Standards Act in tacit recognition of the existing exemption of the processing farmers under the agricultural exemption.

In § 13 (a)(10),[7] Congress similarly exempted from the wage and hour provisions of the Act all employees *"within the area of production* . . . engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market . . . ." (Italics supplied.) It is argued that, by failing to list sugar cane processing specifically in § 13 (a)(10), Congress implies that the general agricultural exemption is not applicable to sugar cane processing. No such conclusion is justified. Section 13 (a)(10) was added late in the legislative development of the bill, not to restrict existing exemptions, but to create further exemptions. It was added in order to exempt the activities of packers, ginners and others providing service anywhere "within the area of production." If § 13 (a)(10) had listed sugar cane processing, it would have extended the minimum wage exemption to independent processors throughout surrounding areas of production. To do so was entirely optional with Congress and its mere failure to do so implies no purpose, *sub silentio,* to reduce the scope of the agricultural exemption already extended, in positive and sweeping terms, in response to an insistent demand for the exemption of all farming operations.

Accordingly, while I concur in reversing the judgment of the Court of Appeals and in the application of the agricultural exemption to the extent that it is applied by this Court, I would remand the entire cause to the District Court with a direction to enter judgment in favor of the Waialua Agricultural Company in accordance with this opinion.

---

[7] 52 Stat. 1067, 29 U. S. C. § 213 (a)(10).