James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

IDLE–WILD FARM, Inc., Defendant.

Civ. A. No. 5791.

United States District Court
D. Connecticut.

May 28, 1957.

Thomas L. Thistle and Albert H. Ross, U. S. Dept. of Labor, Boston, Mass., for plaintiff.

Alfred F. Wechsler, Hartford, Conn., Manuel Katz, Boston, Mass., for defendant.

J. JOSEPH SMITH, Chief Judge.

### Findings of Fact

1. The defendant, Idle-Wild Farm, Inc. is a corporation organized under the laws of the State of Connecticut.

2. The defendant owns and operates a farm containing 156 acres, located in Pomfret Center, Connecticut—a village having a population of about 2,000. The

defendant has an agreement with a number of farmers (the number varying from 22 in 1954 to a high of 55 in the summer of 1956), located at varying distances not exceeding 25 miles from the defendant's farm.

3. The defendant's plant where the Rock Cornish Game Hens are slaughtered, dressed, eviscerated, packed, and shipped is within the "area of production" as that term has been defined by the Secretary of Labor.

4. The defendant raises the Rock Cornish Game Hen—cross of a white Cornish cock and White Rock hen. This cross had never been marketed before its introduction to the trade by the defendant in 1950. Jacques Makowsky, founder and president of Idle-Wild Farm, Inc., personally coined the name Rock Cornish Game Hen which did not exist before, and took out patent registration, Serial Number 653,268; Trade Mark 595,277. The cross has characteristics of its own, different from ordinary chicken, such as fully rounded breast, finely grained all white meat, and especially a unique sweet, completely different, flavor. This result was attained after extensive work and experimentation of different elements of crossing, housing and feeding the Rock Cornish Game Hen. This new eating item became a best seller first in fancy eating places and then spread into food stores and markets for sales to the consumer. In 1954 this unique breed and exclusive type of poultry business started being copied by imitators in ever-growing numbers from coast to coast. It is a delicate, temperamental bird which must be handled with restraint and utter cleanliness throughout its brief life. It must be slaughtered when six weeks old, at which time the live weight of 1½ pounds is attained, corresponding to one pound dressed, ready to cook weight. Once slaughtered, it must be immediately cooled, then packed in an individual plastic bag and continuously thereafter kept under refrigeration, using natural or dry ice. If permitted to grow beyond a weight of 1½ pounds or if not packed immediately after slaughter and dressing in an individual plastic bag and continuously thereafter refrigerated until placed in the oven, it will lose a great part of its moist, delicate and sweet flavor and its appeal as a gourmet item.

5. The defendant purchases one day old chicks which have been hatched in one of four hatcheries. Some of the chicks are then raised on the defendant's own farm. The remainder are delivered to the other farms where, under an agreement with the owners of those farms, they are raised in flocks, averaging about 6,000 chicks to a flock.

6. By the terms of the agreement with the owner of the other farms, the defendant supplies the chicks and the bedding, feed, vaccines, equipment for injecting the vaccines, paints, etc., to the owner of the other farms who care for and feed the chicks under the direction and supervision of the defendant; and as compensation for the use of the farm and for his services, the defendant pays the owner of the other farms one cent a week for each chick in the flock for the first six weeks and should any of the chicks in that flock be left with the owner after six weeks, one-half cent for each such chick for each week thereafter, as well as the cost for all fuel and electricity.

7. Once or twice a week the defendant's general manager or one of his assistants visits the other farms. There he supervises the preparation of the inoculation and observes the method of feeding, feed consumption, litter conditions, water supply and ventilation. He gives the owners instructions and suggestions for rectifying any undesirable conditions. They discuss any problem which may arise. Unless an unusual problem arises the general manager or his assistant spends about ten minutes at the other farms.

8. Title to the chicks raised on the other farms remains at all times in the defendant. The defendant pays all personal property taxes assessed on those chicks. It and not the owner of the other farms suffers the loss when any of those chicks die. The defendant carries

insurance on all of its fowl including those raised on the other farms.

9. From time to time when there is not sufficient demand for the item known as the Rock Cornish Game Hen, those chicks which are not required to meet the demand of the defendant's customers are permitted to grow to about three pounds and over each (1½ or more pounds beyond the weight of the item known as the Rock Cornish Game Hen) and are sold live as ordinary fowl for varying prices averaging 50–70 cents a bird; that is, an average of 16 to 23 cents per pound depending on the poultry market. Each of these birds cost on the average 75 to 80 cents or more to grow— more than what was realized from the sale.

10. Those chicks which are to be sold as Rock Cornish Game Hens are caught when six weeks old, that is, at 1½ pounds, placed in crates and then carried by truck to the defendant's plant. They are then placed live on a moving belt line, killed and run through a steaming section after which the feathers are removed, all by mechanical process. The few remaining feathers are then removed by hand. The legs and head are then removed and the carcasses are eviscerated, washed, cooled and weighed. They are dropped in a large metal box from which they are packed individually in plastic bags by employees who place them in iced crates for immediate interstate shipment. Almost all of the Rock Cornish Game Hens are shipped to buyers outside the State of Connecticut. Approximately 97% of the defendant's birds are sold to dealers for resale and to hotels, restaurants and markets. Each of the birds sold as a Rock Cornish Game Hen is sold at an average price of $1.10 to $1.15. The cost of raising the Rock Cornish Game Hen is approximately fifty cents per bird and the cost of slaughtering, dressing, eviscerating and packing about twelve and a half cents.

11. Catchers, together with truck drivers and truck helpers, go to the various farms including the defendant's farm, catch the birds, put them in crates, place the crates on the trucks and carry the crates by truck to the defendant's plant where the crates are unloaded and placed on a conveyor belt by catchers and truck helpers.

12. Employees who work in defendant's plant perform the following operations:

(a) Hangers—the employees designated as hangers perform either one of two operations, (1) they open the crates and hang the live fowl on a "killing" conveyor belt, or (2) remove the hens from the "killing" conveyor belt and place them in a tank for cooling or on an "eviscerating" conveyor belt.

(b) Killers—these employees slit the throats of the hens as they are carried along the "killing" conveyor belt.

(c) Pinners—these employees, after the slaughtered fowl pass through a steaming section which softens and automatically removes most of the feathers, then remove the remaining feathers by hand.

(d) Eviscerators—these employees eviscerate the birds, that is, they remove the head, crop, entrails, and other nonedible portions of the hen.

(e) Packers—these employees insert each eviscerated fowl into a plastic bag and place the packed hen in an iced crate for shipment.

(f) Shipping employees insert the dressed hen in the appropriate container and perform all necessary shipping operations.

(g) Clerical employees—these employees handle all the clerical work including preparation of letters, invoices, remittances and correspondence and prepare the payroll.

All of the employees whose duties are described in this paragraph perform these operations both on birds which are raised on defendant's farm and on other farms.

13. With the exception of the supervisors, all employees of the defendant at its plant are paid on a straight hourly basis for all hours worked. That is, the defendant does not compensate such em-

ployees at a rate of 1½ times the regular rate of pay for hours worked beyond forty in the work week.

In 1954 an average of 45 employees worked in the defendant's plant. This number includes catchers and truck helpers but does not include office employees. An average of 17 employees worked an average of 14¼ hours overtime weekly during that year.

In 1955 an average of 64 employees worked in the defendant's plant. This number includes catchers and truck helpers but does not include office employees. An average of 37 employees worked an average of 10½ hours overtime weekly during that year.

In 1956 an average of 99 employees worked in the defendant's plant. This number includes catchers and truck helpers but does not include office employees. An average of 40 employees worked an average of 8½ hours overtime weekly during that year.

14. In 1954 the payroll of the employees in the defendant's plant totalled $115,336.70, as compared to a total of $218,605.07 of which $76,602.14 represents payments to the owners of other farms. Excluding payments to owners of other farms, the respective payroll totals are $115,336.70 for the plant payroll and $142,002.83 for the overall payroll.

In 1955 the payroll of employees in the defendant's plant totalled $173,452.21 as compared to a total of $312,679.69 of which $92,493.08 represents payments to the owners of other farms. Excluding payments to owners of other farms, the respective payroll totals are $173,452.21 for the plant payroll and $220,186.61 for the overall payroll.

In 1956 the payroll of employees in the defendant's plant totalled $267,285.59 as compared to a total of $507,757.43 of which $169,352.07 represents payments to the owners of other farms. Excluding payments to owners of other farms, the respective payroll totals are $267,285.59 for the plant payroll and $338,405.36 for the overall payroll.

15. The quantity of fowl sold follows:

| | Total Raised | Sold Live as Ordinary Fowl (as described in Paragraph 9) | Sold Processed |
|---|---|---|---|
| 1954 | 716,394 | 109,786 | 606,608 |
| 1955 | 999,645 | 49,074 | 950,571 |
| 1956 | 1,749,487 | 269,173 | 1,480,314 |

Of the total raised in each year, at least 98% were Rock Cornish Game Hens. About 100,000 were raised each year on the defendant's farm; the remainder for each year was raised on the other farms.

16. The defendant's investments in fixed assets have been divided as follows:

| | Land, Buildings & Equipment Exclusive of Plant and Equipment therein | Plant and Plant Equipment |
|---|---|---|
| 1954 | $106,272.12 | $ 68,213.48 |
| 1955 | 130,746.96 | 103,375.78 |
| 1956 | 145,112.78 | 142,893.78 |

17. Makowsky bought the farm on which defendant operates in 1948. When the corporation was formed in 1951 a parcel of some 40 acres, on which was situated Makowsky's home, was retained in his ownership, the remaining 156 acres deeded to the corporation. All the poultry raising and processing done by the corporation itself are done on the parcel owned by the corporation.

18. In 1951 the entire operation was performed on the defendant's farm. As demand grew, additional poultry houses were built on the farm. Later the ar-

rangement with neighboring farmers, referred to above, was entered into.

19. Thereafter, one of the poultry houses on defendant's farm was converted to use in connection with processing, leaving one two-story poultry house in use as such on defendant's farm, with a capacity of approximately 12,000 birds at one time.

20. The average time for the Rock Cornish birds to mature from day old chicks is 5½ to 6½ weeks. About one week is spent between flocks in cleaning the poultry houses. Maximum capacity is therefore approximately 7 crops per year.

21. The flocks of the outside farmers vary from 3,000 to 20,000 birds, with the average about 6,000.

22. About 70% of the birds produced in 1954 were produced off defendant's farm, increasing until in 1956 some 94% were produced on 54 farms.

23. Production has decreased in 1957, about 35 farms at present producing.

24. The care of birds on defendant's farm itself requires only part time of one employee.

25. The care of 4,000 birds on a typical off farm operation takes one person an average of 3 hours daily, 6,000 birds, 4 hours a day.

26. Sales are largely to food brokers and distributors, a dozen or two brokers and a couple of hundred distributors.

27. Sales were originally of fresh birds, but sales of frozen birds have increased until today some 75% are sold frozen.

28. When shipments are made to any distance, of either fresh or frozen birds, it is important that they be packed just prior to departure to avoid spoilage.

29. Prior to August 1955 shipments went by rail express on trains leaving at 10:15 a.m. and 8:59 p.m. Since the August 1955 floods destroyed the railroad line it has been necessary to ship by truck alone, or by truck to Springfield, Massachusetts, and rail from Springfield.

30. Prior to 1957 defendant purchased mature birds only to the extent of less than 1% of output, as an accommodation only.

31. In 1957 larger scale purchases of mature birds have been made, to the extent of 20,000 the month of January, in an effort to distribute the risk of loss from fluctuating demand between defendant, the hatchery and the grain supplier.

32. If found advantageous, such purchases are planned to continue to the extent of 20% of output.

33. Retail sales in 1956 amounted to between $50,000 and $60,000.

34. Stuffed birds, stuffed with dressing prepared according to defendant's formulae, all of which are shipped frozen, amount to approximately 10% of total output.

35. Boned and stuffed birds amount to 3 to 4% of total output.

36. No other poultry farmers in the defendant's area maintain their own processing plants.

37. Defendant's processing plant is designed and adjusted to handle the Rock Cornish birds, and cannot, as at present set up, economically handle larger birds, which are processed for defendant in commercial processing plants.

38. The commercial plants in the defendant's area are not set up to handle economically birds as small as the Rock Cornish birds processed by defendant.

### Conclusions of Law

1. The Court has jurisdiction of the parties and subject matter of the action.

2. Defendant's plant employees are subject to the wage and hour provisions of the Fair Labor Standards Act, 29 U.S. C.A. § 201 et seq.

3. Employment of defendant's plant employees for more than forty hours per week without compensation at one and one half times the regular rate for hours worked in excess of forty is a violation of the Fair Labor Standards Act.

4. Plaintiff is entitled to injunctive relief as prayed.

## Discussion

The plaintiff, the Secretary of Labor, brought this suit pursuant to Section 217 of Title 29, to restrain the defendant, Idle-Wild Farms, Inc. from further alleged violations of Section 215(a) (1) and (2). The defendant, a Connecticut corporation, was founded by its president, Jacques Makowsky, who developed a breed of poultry, the Rock Cornish Game Hen. The main activity of the defendant is the raising, slaughtering, packing and marketing of this poultry product. At the inception of this business in 1950 or 1951, the defendant purchased one day old chicks from hatcheries and raised them in its own hen houses. However, as the demand for defendant's product increased the defendant met the need for more hen house facilities by making arrangements with other farmers in the area, whereby these farmers, referred to as "outside farmers", raised the chicks for the six or seven week period in their own hen houses. By this arrangement the title to the chicks remained in the defendant, their raising was supervised by defendant's employees who visited the outside farms for about ten minutes a week, and all supplies such as feed, bedding, vaccines were furnished to the outside farmer by the defendant. The outside farmer provided the housing for, and the care of, the chicks, receiving a cent per week, per chick in return. By 1956 the defendant produced over 94% of its poultry in this manner. The remaining 6% was raised on defendant's farm by one employee who had other duties in the defendant's plant.

In the normal course of events, defendant's "catchers", assisted by truck drivers and truck helpers, at the end of the six week maturation period, gather in the mature birds from the outside farms and transport them to defendant's plant. In 1956 there were ten such employees.

The birds are then taken to the defendant's plant where they are placed on a conveyor belt, slaughtered, plucked, dressed and packed. The elements of the bird's processing varies with the market demand. Some birds are boned and/or stuffed before packing; some are frozen, others are shipped fresh on ice. In 1956 an average of 89 of defendant's employees worked in the plant. While during the early years of this venture the plant employees also helped in the raising of the birds, the increased volume of defendant's business has brought about a specialization so that none of these 89 employees are involved in the raising of the birds.

In addition to the above employees there were eight employees employed in defendant's office in 1956.

The payroll breakdown for 1956 was:

| | |
|---|---|
| Other Farms | $169,352.07 |
| Plant Employees (including catchers and truck drivers) | 267,285.59 |
| Officers and Office Help | 71,119.77 |
| Total Payroll | $507,757.43 |

In 1956 an average of 40 employees worked an average of 8½ hours overtime weekly without receiving compensation at a rate of 1½ times the regular rate of pay as required by Section 207 of Title 29. The defendant while admitting noncompliance with this section claims an exemption under Section 213(a) (6) and (10). By stipulation the status of only the plant employees is at issue.

 The scope of the agricultural exemption of Section 213(a) (6) is defined in Section 203(f). "Agriculture" as so defined has two meanings: a) the "Primary meaning * * * farming in all its branches" and b) "the broader meaning * * * any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently to or in conjunction with 'such' farming operations". Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 762, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672. There appears to be no serious contention that these plant employees are employed in agriculture in the primary sense. Rather the defendant bases its arguments for exemption on Maneja v. Waialua Agricultural Co., 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040, at-

tempting to include its plant operations within the broader meaning of agriculture. But this broader meaning of agriculture is applicable only to practices which are themselves incidental to agricultural practices in the primary sense. To determine whether an activity is incidental to farming the court must look to the facts surrounding the given practice. The mere fact that an activity is carried on by a farmer, even on a farm, does not of itself cloak that activity with an agricultural exemption. Maneja v. Waialua Agricultural Co., 349 U.S., at page 264, 75 S.Ct. at page 725; Calaf v. Gonzalez, 1 Cir., 1942, 127 F.2d 934, 938. "The question is whether the activity in the particular case is carried on as a part of the agricultural function or is separately organized as an independent production activity." Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. at page 761, 69 S.Ct. at page 1278. In the case of Idle-Wild, its agricultural facilities are completely divorced from its plant operations, with the exception of the small percentage of poultry raised on its own premises. None of its plant workers have any contact with the farms on which the birds are raised. Their function is separate and distinct, geographically and operationally from the function of the farmers who raise the poultry. Thus the question of whether defendant's plant operations could be included in the broader meaning of agriculture as recently dealt with in Manaja v. Waialua Agricultural Co., supra, and Mitchell v. Budd, 350 U.S. 473, 76 S.Ct. 527, 100 L.Ed. 565, does not arise. Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. at page 766, 69 S.Ct. at page 1280.

The exemption provided in Section 213(a) (10) is limited to "quasi industrial" activities which are beyond the scope of ordinary farming but within a specified area of production. The parties have stipulated that the defendant is within one of the specified areas of production. Defendant contends that its plant operations come within the meaning of "handling, packing, storing or pre-

paring" of this section. In Maneja v. Waialua Agricultural Co., 349 U.S. at pages 267–269, 75 S.Ct. at pages 726–728, the Supreme Court held it of crucial significance that sugar milling while specifically exempted by Section 207(c) was not mentioned in the exemption of 213(a) (10). The Court reasoned that the omission of sugar milling in 213(a) (10) indicated that the limited exemption of Section 207(c) marked "the outer limit of congressional concession to this type of processing". A similar statutory scheme exists as to the slaughtering and dressing of poultry. The activity is specifically exempted in Section 207(c) but not mentioned in 213(a) (10). From this the court must conclude that it was not the intent of Congress to grant an overall exemption to this activity under Section 213(a) (10).

The injunction sought by the plaintiff may be granted. Settle order.