**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MONTEREY COUNTY BUILDING & CONSTRUCTION TRADES COUNCIL, Respondent.**

**No. 19053.**

United States Court of Appeals Ninth Circuit.

Aug. 18, 1964.

Rehearing Denied Oct. 31, 1964.

Arnold Ordman, General Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., and Allen M. Hutter, Attorneys all with National Labor Relations Board, Washington, D. C., for petitioner.

P. H. McCarthy, Jr., McCarthy & Johnson, San Francisco, Cal., for respondent.

Before JERTBERG and DUNIWAY, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge.

The National Labor Relations Board has petitioned for enforcement of a cease and desist order issued against the respondent, Monterey County Building and Construction Trades Council, on April 28, 1963. The Board found that respondent had violated (1) Section 8(b) (7) (C) of the National Labor Relations Act, 29 U.S.C. § 158(b) (7) (C), which proscribes recognitional picketing by a labor

organization to force an employer "to recognize or bargain with a labor organization"; and (2) Section 8(b) (4) (i) and (ii) (B) of the Act, 29 U.S.C. § 158 (b) (4) (i) and (ii) (B), which proscribes secondary boycotts.

Respondent has not here attacked the Board's findings relative to the unfair labor practices, but contends that the employees involved were "agricultural laborers" and accordingly exempt from the provisions of the Act. Section 2(3), 29 U.S.C. § 152(3) provides that, "The term 'employee' shall include any employee * * * but shall not include any individual employed as an agricultural laborer * * *." [1]

The charging party, Vito J. LaTorre, and his wife are the owners of all of the stock of three corporations operating poultry ranches in the Watsonville, California, area.[2] The Elkhorn Ranch, the site of the dispute, is not incorporated, but is owned equally by LaTorre and his wife. This ranch did not begin operating until early in the year 1962. The cost of the buildings and equipment exceeded one million dollars.[3]

Construction was started in 1961. In July, 1961, LaTorre contracted with Buckeye Incubator Company, a Delaware corporation primarily engaged in the manufacture of poultry equipment, for the construction of the buildings and equipment on the Elkhorn Ranch. Buckeye subcontracted the actual work of constructing the buildings to Jack L. Whiteside doing business as Jack L. Whiteside Construction Co., a labor contractor, and the electrical work to Sanders Electric Company Inc. Buckeye's own employees installed the poultry raising equipment. LaTorre contracted with Granite Construction Company to per-

form the site preparation, grading and road work.

The employees of Sanders and Granite were represented by labor organizations which were constituent members of Respondent Council. Whiteside employed carpenters, plumbers, electricians and other laborers, none of whom were represented by any labor organization in connection with their employment with Whiteside.

On September 1, 1961, the secretary of Respondent Council requested Buckeye to execute respondent's standard labor agreement. Buckeye refused on the basis that Whiteside employed all the personnel within respondent's jurisdiction, and referred the secretary to Whiteside. Officers of Respondent Council approached Whiteside at the Elkhorn Ranch and asked him to sign the agreement. Whiteside refused, and picketing started on September 20, 1961.

Were the persons employed by Buckeye and Whiteside "agricultural laborers" within the exclusion of section 2(3) of the Act?

Although the Act does not define "agricultural laborer", Congress has supplied a definition by adding a rider to the annual appropriation for the Board, which in effect provides for use of the definition of "agriculture" set forth in Section 3(f) of the Fair Labor Standards Act, 29 U.S. C.A. § 203(f). See N.L.R.B. v. Olaa Sugar Co., 9 Cir. 1957, 242 F.2d 714, 715. This definition reads in pertinent part:

> " 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or

---

1. Respondent contends that this exemption barred the Board from finding that its activities were violative of either section 8(b) (7) or 8(b) (4).

2. All do a substantial business. The largest grossed in excess of $400,000 in 1961 and employs between 30 and 50 persons.

3. The construction project called for the erection of 42 "fryer" buildings, 380 feet by 40 feet, each housing 17,000 chickens; four brooding and two brooder houses, each housing 11,500 chickens, a hatchery capable of handling 20,000 eggs per day; and homes for two managers.

horticultural commodities * * * the raising of livestock, bees, fur-bearing animals, or poultry, and any practices * * * performed by a farmer or on a farm as an incident to or in conjunction with such farming operations * * *."

The Board concluded that the employees of Buckeye and Whiteside were not "agriculture laborers" for two reasons: (1) the interpretation of the Fair Labor Standards Act by the Department of Labor, Wage and Hour Division, "limits the agricultural-labor exemption · to persons performing work on a farm as an incident to or in conjunction with farming operations", and the term "farm" is defined as "a tract of land devoted to actual farming operations." At the time of the commencement of the picketing, there were no active farming operations and the "Elkhorn Ranch was still a tract of land not yet developed into a farm * * *"; and (2) the "construction here appears to be a major independent construction in itself, and not part of an agricultural function".

It is clear that the exemption contained in section 2(3) of the Act was "meant to embrace the whole field of agriculture",[4] but "no matter how broad the exemption, it was meant to apply only to agriculture * * *", and it is necessary in each case to determine "what is and what is not properly included within that term". Maneja v. Waialua Agricultural Co., 1955, 349 U.S. 254, 260, 75 S. Ct. 719, 723, 99 L.Ed. 1040. "A basic factor for determining what practices are incident to or performed in conjunction with a farmer's farm operations is whether the practices are among those ordinarily, customarily, or usually performed by a farmer or on a farm". Mitchell v. Hunt, 5 Cir., 1959, 263 F.2d 913.

In construing Section 3(f) of the Fair Labor Standards Act in Farmers Irriga-

tion Co. v. McComb, 1949, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672, rehearing denied 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513, the Court said:

"Agriculture, as an occupation, includes more than the elemental process of planting, growing and harvesting crops. There are a host of incidental activities which are necessary to that process. Whether a particular type of activity is agricultural depends, in large measure, upon the way in which that activity is organized in a particular society. The determination cannot be made in the abstract. In less advanced societies the agricultural function includes many types of activity which, in others, are not agricultural. * * Economic progress, however, is characterized by a progressive division of labor and *separation of function.* * * * In this way functions which are necessary to the total economic process of supplying an agricultural product become, in the process of economic development and specialization, *separate and independent productive functions* operated in conjunction with the agricultural function *but no longer a part of it.* Thus, the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function *or is separately organized as an independent productive activity.*" (Emphasis added.) 337 U. S. at pp. 706–761, 69 S.Ct. at p. 1277.

Respondent argues that "the Elkhorn poultry farm was but an addition to the family's already extensive poultry farm-

---

4. On the other hand, it is equally clear that the National Labor Relations Act, like the Fair Labor Standards Act, was designed to include all employees not specifically excepted. Cf. Bowie v. Gonzales, 1 Cir., 1941, 117 F.2d 11, 18.

As this court held in construing the Fair Labor Standards Act, the party claiming an exemption has the burden of proving that it comes within the exemption. Coast Van Line v. Armstrong, 9 Cir. 1948, 167 F.2d 705, 707.

ing operations—it was not an 'independent productive activity'. It was not 'major *independent* construction activity'. It was all part and parcel of the family poultry farming operations". This argument, however, misses the point. It is not the independence of the Elkhorn Ranch from the rest of the poultry operation which is in question; it is the fact that the Whiteside Construction Co. and Buckeye Incubator Company are organized separately from any farming or poultry operation and are engaged in a productive activity which is independent from any farming or poultry operations.

■ It cannot be questioned that the Whiteside construction workers—carpenters, electricians, and plumbers—would be "employees" within the terms of the Act, were they building a store, a church or even a home on a tract of land adjacent to the Elkhorn Ranch. Can they be said to lose this status and become "agricultural laborers" because the construction project undertaken happens to form the basis for a farm? It does not appear to us that this construction of the Act would be consistent with the realities of our modern economy. As the Supreme Court said in Farmers Irrigation Company v. McComb, supra, "Economic progress * * * is characterized by a progressive * * * separation of function". These "separate and independent productive functions (are) operated in conjunction with the agricultural function but (are) no longer a part of it". The construction activity and the installation of the equipment, although necessary to the functioning of the poultry ranch, were done by organizations "separately organized as an independent productive activity".

■ We recognize that a farmer might build a barn or silo or brooder house, using the laborers ordinarily and concededly employed as "agricultural laborers", or he might hire individuals to assist in the erection of the particular structure. Where the work is done by persons who are not "separately organiz-ed as an independent productive activity", the agricultural exclusion would be applicable. The determination is not dependent upon "the physical similarity of the activity to that done by farmers in other situations". Farmers do not ordinarily perform the functions of a construction project of the type involved here. Cf. Mitchell v. Budd, 1956, 350 U.S. 473, 481, 76 S.Ct. 527, 100 L.Ed. 565.

■ We recognize also that the extent of mechanization and size of the particular farm does not preclude exclusion under the agricultural exemption where the operations are conducted by the farmer. See Maneja v. Waialua Agricultural Co., supra, where the Court held that persons who operated a railroad, hauling sugar cane from the fields to the processing plant, were within the agricultural exemption where the railroad was owned by the farmer, a large corporation, and operated on the plantation to haul the cane to the corporation's own mill. The Court also held, however, that workers employed in the maintenance of the village and repair of the dwelling houses owned by the corporate farmer but rented to the farmer's laborers were not within the agricultural exemption.

While the exemption relating to agricultural laborers has been construed in many cases, no case has been found involving the precise situation here presented. The analysis of the provisions of the Act and the separation of functions recognized in Farmers Irrigation Co. v. McComb, supra, impel the conclusion that the "agricultural laborer" exception is not applicable and that the employees of Whiteside and Buckeye are covered by the Act.

■ The Board's findings with respect to respondent's unfair labor practices in violation of Sections 8(b) (7) (C) and 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act are supported by substantial evidence.

The Board's petition for enforcement of its order is granted.